IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Midwest Retailer Associated, Ltd., et. al.,                Case No: 3:08CV00851

         Plaintiffs,

     v.                                                                            ORDER

City of Toledo,

         Defendant

      In this case, plaintiffs, owners of neighborhood convenience stores ("owners"), and an association to which they belong, the Midwest Retailers Association (MRA), challenge a municipal licensing scheme that aims to regulate their businesses. Defendant City of Toledo ("City") has distributed license applications to the plaintiffs under newly-enacted Toledo Municipal Ordinance 797-07 ("T.M.O. 797-07 "). The owners now seek a preliminary injunction (Doc. 7) preventing the City's enforcement of Ordinance 797-07, which took effect on May 1, 2008. *See* Fed. R. Civ. P. 65(a). Unless I grant such an injunction, the owners argue, the City will enforce an unconstitutional law that will cause them irreparable injuries.

      The owners allege that the licensing regime in T.M.O. 797-07 "is contingent upon a vague, overly burdensome, and unconstitutional application process" and "vests Toledo City officials with nearly limitless discretion to revoke or refuse to renew licenses." (Doc. 7 at 2). As a result, the owners claim that the law violates the United States Constitution and conflicts with Ohio regulatory law.

Alleging that the "threat of irreparable injury to Plaintiff [MRA] and the store owners it represents is immediate and real,"[1] the owners also point to the criminal ramifications of operating a convenience store without a license; the prospect of lawsuits from governmental, quasi-governmental, and private parties; and the constitutional costs of complying with the law. (Doc. 7 at 2-3).

I convert the owners' request for a preliminary injunction into a motion for a temporary restraining order and grant the order, effective July 1, 2008.

## Background

On December 11, 2007, the Toledo City Council passed Ordinance 797-07 by a vote of nine to two. The ordinance amended the Toledo Municipal Code and created Chapter 721, requiring all convenience stores to obtain a license. The reason for Council's action is stated in the "Summary & Background" section of the ordinance, which provides:

> Toledo City Council has been faced with complaints about the operation of convenience stores, many of which are not subject to the [Special Use Permit] because they pre-date the 1992 zoning regulations. The concerns include the manner of operation, the activity, proximity to other properties, behavior by customers, licensees and the public. The provisions of this Chapter which establish licensing requirements for convenience stores will preserve the best interests of all parties in a more neighborhood-oriented environment because it will apply to all convenience stores. The new requirements will allow for the revocation of licenses for any convenience store that presents a continuing neighborhood problem.

(Doc. 12, Attachment 1).

The Ordinance contains several requirements addressing concerns that led to its adoption. These requirements include: criminal background checks for potential licensees; installation and

---

[1] The Midwest Retailers Association initially brought suit on behalf of its members, but plaintiffs later amended the complaint to bring suit on behalf of convenience store owners in their personal capacities as well. (Doc. 16).

maintenance of a twenty-four-hour surveillance camera system; maintenance of the business premises; and taking appropriate action to curtail gambling, prostitution, the sale of drugs, and other criminal acts on the premises. Failure to meet the appropriate standards or adhere to the enumerated regulations can lead to the City denying or revoking a license to operate a convenience store. This may occur "even though the license holder has taken all reasonable measures to achieve compliance." (Doc. 7-2 at 6 (§721.11(a)(2))).

Plaintiffs now allege that they are likely to prevail on the merits because T.M.O. 797-07: 1) is unconstitutionally vague; 2) conditions the receipt of a license on the convenience store owners' surrender of rights guaranteed by the Fourth, Fifth, Thirteenth, and Fourteenth Amendments, and the *ex post facto* clause; and 3) is preempted by Ohio law. Furthermore, the owners argue that implementation of the law will cause them to suffer immediate and irreparable injury in contrast to the insubstantial injury that an injunction will impose on the City and it citizens. As a result, plaintiffs allege that the public interest favors provisional relief.

### Standard Governing Temporary Restraining Orders

The same standard generally applies to the issuance of temporary restraining orders and preliminary injunctions. *Northeast Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir.2006); *see also Rios v. Blackwell*, 345 F. Supp. 2d 833, 835 (N.D. Ohio 2004). To grant either form of injunctive relief, a court must consider: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent a stay; (3) whether granting the stay would cause substantial harm to others; and (4) whether the public interest would be served by granting the stay." *Northeast Ohio, supra*, 467 F.3d at 1009; *see also Rios, supra*, 345 F. Supp. 2d at 835.

3

No one factor is dispositive; instead I balance all four factors. *In re De Lorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985) ("[T]he four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met."). The burden of persuasion is on the party seeking the injunctive relief. *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).

The nature and purpose of injunctions informs my analysis of the four factors. As the Supreme Court has stated, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Given this limited purpose, a temporary restraining order is customarily granted on the basis of procedures less formal and evidence less complete than one would find in the record of a trial on the merits. *Id.*

## Discussion

### A. Likelihood of Success on the Merits

#### 1. Unconstitutional Vagueness

Plaintiffs cite a pair of Supreme Court cases to support their allegation that T.M.O. 797-07 "fails to give a person or ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute . . . encourag[ing] arbitrary and erratic" enforcement. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972); *see also U.S. v. Harris*, 347 U.S. 612, 617 (1954).

A law so vague that persons of "common intelligence must necessarily guess at its meaning and differ as to its application" violates due process of law. *Planned Parenthood v. Ariz.*, 718 F.2d 938, 947 (9th Cir.1983) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926); *see also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 550-51 (6th Cir. 2007).

4

In practice, this means that a "law is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited or is so indefinite as to allow arbitrary and discriminatory enforcement." *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 554 (9th Cir. 2004) (internal citations omitted); *see also Giaccio v. Penn.*, 382 U.S. 399, 402-03 (1966); *City of Chic. v. Morales*, 527 U.S. 41, 52 (1999).

While void for vagueness claims generally attack criminal statutes, they are not unheard of in the realm of administrative regulations. *Cf. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982); *Eden, supra*, 379 F.3d at 554-55. To succeed, however, such claims must "demonstrate that the law is impermissibly vague in all of its applications." *Village of Hoffman Estates , supra*, 455 U.S. at 497; *Belle Maer Harbor v. Charter Tp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999) ("[V]agueness claims not involving First Amendment freedoms must be examined in light of the facts of the particular case at hand and not as to the statute's facial validity."). The one exception to this rule is statutes implicating criminal penalties. *Belle Maer Harbor, supra*, 170 F.3d at 557 ("An enactment imposing criminal sanctions or reaching a substantial amount of constitutionally protected conduct may withstand facial constitutional scrutiny only if it incorporates a high level of definiteness.").

T.M.O. 797-07 is largely regulatory in purpose and scope. As a result, the owners do not have a substantial likelihood of success with regard to this issue. While the ordinance arguably: 1) fails to provide a reasonable opportunity to know what conduct is prohibited *and* 2) is so indefinite as to allow arbitrary and discriminatory enforcement, the owners, in this suit, cannot demonstrate "that the law is impermissibly vague in all of its applications." *Village of Hoffman Estates , supra*, 455 U.S. at 497.

## 2. Unconstitutional Conditions

The gravamen of plaintiffs' irreparable harm claim is that convenience store owners will have to surrender numerous constitutional protections as a condition of receiving a license. *See, e.g.*, *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n, 23 F.3d 1071, 1077 (6th Cir.1994)* ("[A] state actor cannot constitutionally condition the receipt of a benefit, such as a liquor license or an entertainment permit, on an agreement to refrain from exercising one's constitutional rights . . . ."). These rights include: 1) the Fourth Amendment's protections against unreasonable search and seizure; 2) the Fifth Amendment's protections against the government's taking of private property without just compensation; 3) the Thirteenth Amendment's protections against involuntary servitude; and 4) Article 1, § 9's protection against the passage of *ex post facto* laws.

### a. Unreasonable Search and Seizure

Plaintiffs allege that T.M.O. 797.07's requirement that convenience stores own and maintain a surveillance camera violates their Fourth Amendment rights. According to the owners, the camera not only imposes forced surveillance, it also allows for the warrantless seizure of the surveillance tapes.

It is unquestionable that the Fourth Amendment's protection against unreasonable search and seizure extends to both commercial premises and administrative searches. *See, e.g.*, *U.S. v. Burger, 482 U.S. 691, 699-700 (1987)*; *Marshall v. Barlow's, Inc., 436 U.S. 307, 312 (1978)* ("[I]t is untenable that the ban on warrantless searches was not intended to shield places of business as well as of residence."). The search in question, however, is more attenuated than the standard administrative search of a business. Rather than allowing physical searches, the City's ordinance requires business owners to install surveillance cameras on the premises, operate the cameras

6

twenty-four hours a day, archive the surveillance tapes, and make these tapes available to any "authorized" Toledo City official on eight hours notice. The ordinance also requires the convenience store position the camera "to provide photographic coverage of the cash register or place where money is exchanged or other area approved by the Director of Finance" and that the camera "be subject to periodic inspections by the Business License Division, the Toledo Police Department or any authorized City official." (Doc. 7-2 at 6-7 (§ 721.13(a)-(b)(1))).

In some situations the ordinance's installation requirement would not offend the Fourth Amendment. As I read it, T.M.O. 797-07 only requires the camera record "those areas which are open to the public." *Cf. U.S. v. Branson*, 21 F.3d 113, 116 (6th Cir. 1994) (noting that the district court's interpretation of a regulatory statute "would authorize nothing more than that which motor vehicle inspectors can already do without a warrant – look at cars during business hours at dismantlers' establishments in those areas which are open to the public"). Therefore, in twenty-four-hour convenience stores, the requirement that owners have a camera recording public areas of the store – i.e. those portions of the store in which the owner would not have a reasonable expectation of privacy – does not necessarily violate the Fourth Amendment.[2] *Katz v. U.S.*, 389 U.S. 347, 361 (1967); *U.S. v. Ellison*, 462 F.3d 557, 561 (6th Cir. 2006) ("A tenet of constitutional jurisprudence is that the Fourth Amendment protects only what an individual seeks to keep private.").

In contrast, recordings made outside of store hours – if later requested by police – potentially infringe on the owners' Fourth Amendment rights. After a store closes, its owner has a reasonable

---

[2]

There are, however, some exceptions. An unknown camera, filming from an intrusive vantage point inaccessible to the general public, could be a violation of the Fourth Amendment despite the fact that "the recorded transactions occurred during business hours in a place accessible and visible to the public." *State v. Thomas*, 642 N.E.2d 240, 242-44 (Ind. Ct. App. 1995).

7

expectation of privacy as he or she may lawfully exclude the public from the establishment. *See, e.g.*, *People v. Galvadon*, 103 P.3d 923 (Col. 2005) (employee has a reasonable expectation of privacy in back room of store); *cf. State v. Thomas*, 642 N.E. 2d 240, 242-44 (Ind. Ct. App. 1995) (reasonable expectation of privacy when filming is done from a vantage point inaccessible to the general public). Therefore, I must examine whether, in this situation, the statute's surveillance camera section is an exception to the warrant requirement.

In *Burger, supra*, 482 U.S. at 702-03, the Supreme Court recognized an exception to the warrant requirement for government searches of "pervasively regulated business[es]." *See also U.S. v. Biswell*, 406 U.S. 311 (1972); *Colonnade Corp v. U.S.*, 397 U.S. 72 (1970). The Court felt that because the owners and operators of these commercial premises have "a reduced expectation of privacy, the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a government search, have lessened application in this context."[3] *Burger, supra*, 482 U.S. at 702 (internal citations omitted); *see also Barlow's, supra*, 436 U.S. at 313 ("[Pervasively regulated] industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise." (internal citation omitted)).

Based on precedents and the evidence presented at oral argument (outlining the numerous licensing, safety, and other regulatory regimes imposed on convenience stores), it is clear that state and local governments closely regulate convenience stores. *See Contreras v. City of Chi.*, 920 F.Supp. 1370, 1389 (N.D. Ill. 1996) (noting that "[t]he food industry has long been held to be such

---

[3]

The Supreme Court has indicated that the exception to the warrant requirement also applies when "the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened." *U.S. v. Burger*, 482 U.S. 691, 702 (1987).

a closely regulated industry"); *Aida Food and Liquor, Inc. v. City of Chi.*, 2005 WL 736015, at * 7 (N.D. Ill.) ("Aida, a food and liquor convenience store, is in a pervasively regulated industry."). This decision, however, does not end the analysis for "[e]ven in a closely regulated industry . . . the government does not have an automatic free pass to search private premises." *Hodgins v. U.S. Dep't of Agric.*, 238 F.3d 421, 2000 WL 1785733, at *5 (6th Cir.) (unpublished disposition).

A warrantless search of a "pervasively regulated business" is reasonable only if the regulatory regime meets three criteria. *Burger, supra*, 482 U.S. at 702-03. First, "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made." *Id.* at 703 (citations omitted). Second, the inspection program must "be 'necessary to further [the] regulatory scheme.'" *Id.* (quoting *Donovan v. Dewey*, 452 U.S. 594, 600 (1981)). Third, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." *Id.* (quoting *Donovan, supra*, 452 U.S. at 603). To meet the last requirement "the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers" by limiting the "time, place, and scope" of the search. *Id.* (quoting *Biswell, supra*, 406 U.S. at 315).

The defendant shows a substantial government interest that informs the regulatory scheme. Protection of the public and convenience store employees from dangerous activities and crime – the goal of the ordinance – is unquestionably a legitimate and substantial government interest. Furthermore, the camera requirement, and related periodic inspections, arguably further that interest.

9

Nevertheless, the details of the surveillance and inspection program, in combination with the requirement that "upon the request of a City official," the recordings "shall be provided to the official no later than eight (8) hours after the request," implicates the second and third *Burger* criteria. (Doc. 7-2 at 7). This is because the statutory regime endorses unnecessary and constitutionally inadequate: 1) searches of the stores' premises without a warrant and 2) seizures of the stores' surveillance tapes without a warrant.

As already explained, a warrant would be necessary for the City to gain entry to and search convenience stores after operating hours. *Cf. Lo-Ji Sales, Inc. v. N.Y.*, 442 U.S. 319, 329 (1979) ("[T]here is no basis for the notion that because a retail store invites the public to enter, it consents to wholesale searches and seizures that do not conform to Fourth Amendment guarantees."). Furthermore, the City would need a warrant to install its own after hours surveillance camera on the premises. *Cf. U.S. v. Torres*, 751 F.2d 875, 882 (7th Cir. 1984) (explaining that television surveillance is "exceedingly intrusive  .   .   .  and inherently indiscriminate, and that it could be grossly abused – to eliminate personal privacy as understood in modern Western nations"). Yet the City's ability to demand the tapes, which would record "24 hours per day without interruption," provides it with a functional equivalent of constant warrantless surveillance. (Doc. 7-2 at 6 (§ 721.13(a)). This includes recordings of the interior of the stores when they not open, a precaution that will never protect business invitees, and will only rarely, if ever, protect convenience store employees, from criminals.

Supreme Court case law also "suggest that for warrantless searches to be justifiable under a regulatory scheme, the object of the search must be something that can be quickly hidden, moved, disguised, or altered beyond recognition." *Hodgins, supra*, 238 F.3d 421, 2000 WL 1785733, at *7

(unpublished disposition). In contrast "if a regulation is similar to a building code . . . where violations will be harder to conceal, the need for surprise will be less pressing, and warrantless searches will be more likely to be unconstitutional." *Id.*

I do not see how surprise is necessary to further the regulatory scheme in this situation. The ordinance requires convenience stores retain security tapes for thirty days. If destruction in violation of the law is a concern, the warrantless seizure will not provide any protection as eight hours is plenty of time to hide, move, disguise, or alter the tapes.

Even if T.M.O. 797-07 only required the surveillance cameras to tape activity at the cash register during the store's hours of operation, it is not clear that the City could demand tapes without a warrant. This is because "the concept of 'required records' is not synonymous with the absence of a privacy interest." *Kings Island, supra*, 849 F.2d at 995. Employers have a privacy interest in records, even if "required by law to keep them." *Id.* (citing *Brock v. Emerson Elec. Co.*, 834 F.2d 994 (11th Cir. 1987).[4]

Without these flaws, however, the ordinance would serve as an adequate substitute for a warrant. The law puts store owners on notice that there may be "periodic inspections" and establishes the scope of those inspections. Were it not an unnecessary seizure, the section allowing for the collection of tapes would also meet the third *Burger* requirement. *See, e.g.*, *Branson, supra*, 21 F.3d at 117. *But see* *Barlow's*, 436 U.S. at 323 (explaining the provision "devolves almost

---

[4]

Furthermore, the defendant does not express any concern "that a warrantless inspection of the [tapes] is necessary for detection and deterrence of violations of the Act, and is not concerned that employers will alter or destroy the [tapes] upon being given notice and a hearing." *McLaughlin v. Kings Island*, 849 F.2d 990, 996 (6th Cir. 1988).

11

unbridled discretion upon executive and administrative officers, particularly those in the field" (*quoted in Kings Island, supra*, 849 F.2d at 997)).

Because the City fails to establish that the warrantless search and seizure provisions outlined in § 721.13 of T.M.O. 797-07 are necessary to further the regulatory scheme, there is a definite and substantial likelihood that plaintiffs will succeed in showing that the ordinance imposes unconstitutional conditions.[5]

### b. Taking Claim

Plaintiffs also assert that the City's enforcement of T.M.O. 797-07 will amount to a taking without just compensation, in violation of the Fifth Amendment.

The Fifth Amendment prohibits any taking of private property absent just compensation. The owners' Fifth Amendment argument is twofold: 1) the ordinance unlawfully deprives owners of their rights of ownership in the security camera, constituting a regulatory taking of the camera; and 2) the City's requirement that the owners keep the camera on the premises constitutes a physical taking in the form of a permanent physical occupation in each convenience store. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 US 419, 426 (1982); *Waste Mgmt., Inc. v. Metro. Gov't of Nashville*, 130 F.3d 731, 737 (6th Cir. 1997) ("The Supreme Court has recognized two categories of takings: regulatory and physical.").

I first address the plaintiffs' assertion that the ordinance effects a regulatory taking of the cameras. To make a plausible argument that the City has effectively wrested ownership of the cameras from the store owners, plaintiffs must show that the ordinance abrogates their property

---

[5]

During oral argument, counsel for the City admitted as much, conceding that the City did a poor job drafting some of the ordinance's provisions which, as they currently stand, are incompatible with the Fourth Amendment.

rights. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 US 419, 435 (1982) ("Property rights in a physical thing have been described as the rights 'to possess, use, and dispose of it.'" (quoting *U.S. v. General Motors Corp.*, 323 U.S. 373, 378 (1945))). In assessing the alleged abrogation, there is no "set formula." *Penn Cent. Transp. Co v. City of N.Y.*, 438 U.S. 104, 124 (1978). Instead, I consider several factors, including: "[t]he economic impact of the regulation on the claimant"; 2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and 3) "the character of the governmental action." *Id.*; *Waste Mgmt., supra*, 130 F.3d at 737. A "taking" may more readily be found when the "interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent., supra*, 438 U.S. at 124 (internal citation omitted).

It is true that the owners are unable fully to control the cameras, as the ordinance mandates the camera's presence and use. Nevertheless, under the ordinance the City will not completely control each camera. While the ordinance dictates what images that camera must capture, it does not control where or how the owner positions the camera to capture that image and does not prohibit the owner from making other uses of the camera when it is not meeting the requirements imposed by T.M.O. 797-07. *See Brown v. Legal Found. of Wash.*, 538 U.S. 216, 233-34 (2003). Furthermore, the requirements in question have little economic impact on the owners' ownership rights and – since the cameras still serve a security purpose – the regulations do not interfere with the owners' investment expectations.

As a result, the owners have little likelihood of success on their regulatory takings claim. Were the claim to succeed, however, I would deal with the permanent physical occupation claim, as the City would own a camera occupying a portion of each convenience store.

The Supreme Court has been quite clear that any permanent physical occupation of private property by the government or a third party (through legislation) is a *per se* taking. *See Loretto, supra,* 458 U.S. 427 ("When faced with a constitutional challenge to a permanent physical occupation of real property, this Court has invariably found a taking"). Therefore, if the plaintiffs succeed in their argument that the cameras are City property, then they will have a strong likelihood of success on their permanent physical occupation claim.

### c. Involuntary Servitude

The owners contend that T.M.O. 797-07 violates the Thirteenth Amendment because it creates a condition of involuntary servitude "by transferring to selected business owners duties and responsibilities traditionally reserved for law enforcement personnel." (Doc. 7 at 11).

The contemporary view is that involuntary servitude claims, to be cognizable, relate to extreme cases, such as labor camps, isolated religious sects, and forced confinement. *See, e.g.*, *Alkire v. Irving,* 330 F.3d 802, 816-17 (2003) (explaining that when defendant is indigent, imprisonment for failure to pay fines is a violation of the Thirteenth Amendment); *U.S. v. King,* 840 F.2d 1276, 1280 (6th Cir. 1988) (members of religious sect "repeatedly used and threatened to use physical force to make the children [at their camp] perform labor and the children believed they had no viable alternative but to perform such labor"); *Jobson v. Henne,* 355 F.2d 129, 131-32 (2d Cir.1966) (patients in mental institution performing required labor stated claim for violation of Thirteenth Amendment); *Santiago v. City of Phila.,* 435 F. Supp. 136, 156-57 (E.D. Pa.1977) (refusing to

14

dismiss Thirteenth Amendment claim filed by juveniles detained and forced to work at a youth service center).

In contrast, when the state has conditioned a privilege or license on the recipient's providing a specified service, courts have generally found no violation of the Thirteenth Amendment. *See Watson v. Graves*, 909 F.2d 1549, 1552-53 (5th Cir.1990) (explaining that inmates "choice of whether to work outside of the jail for twenty dollars a day or remain inside the jail and earn nothing" was not violation of the Thirteenth Amendment); *U.S. v. 30.64 Acres of Land*, 795 F.2d 796, 800-01 (9th Cir.1986) (noting that the "duty of public service is a condition of practicing law," which does not constitute a taking under the Fifth Amendment); *U.S. v. Redovan*, 656 F. Supp. 121, 128-29 (E.D. Pa.1986); *see also Rowe v. City of Elyria*, 38 Fed. Appx. 277, 283 (6th Cir. 2002) (unpublished disposition) (plaintiff forced to choose between mowing lawn or paying fine).

It is highly unlikely that the owners will be able to make out a claim that the work they must do to meet the requirements of T.M.O. 797-07 – and therefore to obtain and retain a license to operate a convenience store – amounts to involuntary servitude. Plaintiffs, therefore, have failed to persuade me that there is a substantial likelihood that they will prevail on their Thirteenth Amendment constitutional conditions claim.

### 3. The *Ex Post Facto* Clause

The owners claim that the ordinance violates the *ex post facto* clause because §721.04(e) appears to state that if a license applicant has "been convicted of any crime related to the occupation for which the license is sought," the City shall not award the applicant a license. (Doc. 7-2 at 3).

Article I, § 10, of the United States Constitution forbids states from passing *ex post facto* laws, effectively barring criminal laws that impose retroactive punishments for crimes. *Cal. Dep't*

15

*of Corrections v. Morales*, 514 U.S. 499, 504 (1995). Any analysis of a challenged law, therefore, must look at whether the law punishes. If the legislature intended "to impose punishment, that ends the inquiry." *Smith v. Doe*, 538 U.S. 84, 92 (2003). In contrast, if it aimed to "enact a regulatory scheme that is civil and nonpunitive," I must "further examine whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Id.* (internal quotation marks and brackets omitted).

The *ex post facto* clause: 1) ensures that individuals are given "fair warning" of the effect of legislation and the ability to rely on the meaning of such legislation until changed; and 2) "restricts governmental power by restraining arbitrary and potentially vindictive legislation." *Carmell v. Tex.*, 529 U.S. 513, 566 (2000) (quoting *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981)). While this clause prohibits numerous forms of legislative action, the one most relevant here is the prohibition on a law that "changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Calder v. Bull*, 3 U.S. 386, 390-91.

The plaintiffs have not persuaded me that they have a substantial likelihood of success on this issue. The revocation or denial the license is not a criminal or punitive penalty, has a rational connection to a nonpunitive purpose, and is not excessive in relation to the regulatory purpose. *See, e.g.*, *Smith, supra*, 538 U.S. at 103 ("The Ex Post Facto Clause does not preclude a State from making reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences."); *see also Doe v. Bredesen*, 507 F.3d 998. 1003-06 (6th Cir. 2007).[6]

### 4. Preemption

---

[6]

While T.M.O. 797-07 makes it a fourth degree misdemeanor to operate a convenience store without a license, that is a separate criminal act that applies to an owner regardless of previous criminal convictions.

Plaintiffs contend that T.M.O. 797-07 violates the Ohio Constitution because it directly conflicts with a general law.

The Ohio Constitution provides municipalities with "home rule" power, described as the authority to "exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws." Ohio Const. § 18.03. Because the state, through the Department of Liquor Control and R.C. § 4303.27, already provides liquor licenses to a majority of stores controlled by the ordinance, the owners claim that state authority supersedes the City's power to license convenience stores.

A municipal ordinance in Ohio exceeds it a city's "home rule" authority if "(1) the [municipal] ordinance is an exercise of the police power, rather than of local self-government, (2) the [state] statute is a general law, and (3) the ordinance is in conflict with the statute." *Mendenhall v. Akron*, 117 Ohio St.3d 33, 37 (2008); *Canton v. State*, 95 Ohio St.3d 149, 151 (2002).[7]

The ordinance at hand is not related solely to self-government, but rather is an exercise of the City's police power. *Auxter v. City of Toledo*, 173 Ohio St. 444, 446 (1962) (stating that "a municipal ordinance prohibiting the doing of something without a municipal license to do it would be a municipal police regulation.").

To decide whether a state statute is a "general law," the Supreme Court of Ohio established a four-part test: "a statute must (1) be part of a statewide and comprehensive legislative enactment, (2) apply to all parts of the state alike and operate uniformly throughout the state, (3) set forth police, sanitary, or similar regulations, rather than purport only to grant or limit legislative power of a

---

[7] If the court finds that the "conflicting city ordinance relates solely to self-government, the analysis stops, because the constitution authorizes a municipality to exercise all powers of local self-government within its jurisdiction." *Mendenhall, supra*, 117 Ohio St.3d at 37.

municipal corporation to set forth police, sanitary, or similar regulations, and (4) prescribe a rule of conduct upon citizens generally." *Canton, supra*, 95 Ohio St.3d at 153. I find that R.C. § 4303.27 satisfies each of these prongs and is a general law of Ohio. *Auxter, supra*, 173 Ohio St. 444, 447 (treating R.C. § 4303.27 as a general law).

Finally, for T.M.O. 797-07 to conflict with R.C. § 4303, it must "permit[] or license[] that which the statute forbids and prohibits, and vice versa." *D.A.B.E., Inc. v. City of Toledo*, 292 F. Supp.2d 968, 973 (2003) (quoting *Middleburg Heights v. Ohio Bd. of Bldg. Standards*, 65 Ohio St.3d 510, 512 (1992)). Plaintiffs allege that, by not providing a license to a convenience store the state has licensed to sell liquor, the City will deny that store the right to sell alcohol as permitted under state law.

Some cases have held that state liquor laws preempt municipal regulations. *City of Westlake v. Mascot Petroleum Co.*, 61 Ohio St.3d 161, 168 (1991) (explaining that when the state has issued a "valid permit for the sale of alcoholic beverages" to certain businesses "a municipality is without authority to extinguish privileges arising thereunder through the enforcement of zoning regulations."). For example, in *Auxter, supra*, 173 Ohio St. at 446-48, the Supreme Court of Ohio held that a municipal ordinance prohibiting the sale of beer or intoxicating liquor without a license could not supercede a state license permitting the sale of beer or intoxicating liquor.

The facts of *Auxter*, however, are distinct from those in this case. To assess whether a conflict exists between state and local authority, "a court refers to the language of the statute to determine whether the General Assembly intended to preempt local regulation on the subject." *Westlake, supra*, 61 Ohio St.3d at 164. There is no evidence to suggest that the Assembly intended Ohio's liquor control laws to preempt the authority of municipalities to license the operation of

18

convenience stores. *Cf. City of East Cleveland v. Scales*, 10 Ohio App.3d 25, 26 (1983) ("The law in Ohio on 'conflict' is stringent. Pre-emption is not easily demonstrated."). Unlike an ordinance which explicitly prohibits the sale of beer and other intoxicating liquors without a license from the city, T.M.O. 797-07 does not explicitly prohibit that which the state permits. *See D.A.B.E., Inc., supra*, 292 F. Supp.2d at 973; *Auxter, supra*, 173 Ohio St. at 446-47; *see also Westlake, supra*, 61 Ohio St.3d at 161 (syllabus) (statute prohibiting "the sale of alcoholic beverages at service stations").[8]

As a result, the owners do no demonstrate a substantial likelihood of success on the merits regarding their preemption claim.

## B. Irreparable Injury

Several of the owners' claims – though speculative in nature – would lead to potential irreparable injury absent the imposition of a temporary restraining order. First, there are several precedents supporting a "presumption of irreparable injury that flows from a violation of constitutional rights." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996); *Planned Parenthood Assoc. of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) (agreeing with the district court "that there is potential irreparable injury in the form of a violation of constitutional rights"). With regard to the Fourth Amendment claim, I am persuaded that the owners present a showing of potential irreparable injury absent a restraining order.

---

[8]

The owners' analysis would also effectively invalidate numerous municipal health and safety laws, as noncompliance with these laws would also lead to the closure of businesses which the state otherwise permits to sell liquor.

In contrast, the *ex post facto*, Thirteenth Amendment, and preemption claims are so misguided on the merits that I cannot foresee any amount of irreparable injury compensating for the minimal likelihood of success.[9]

### C. Substantial Harm to Others

Based on the facts before me, it does not appear that granting the temporary restraining order would cause substantial harm to others. The City of Toledo will not suffer substantial injury as a result of my issuing a temporary restraining order and although the ordinance aims to deal with crime prevention, there is no evidence that delaying its implementation and maintaining the status quo will cause or condone criminal activity.

### D. The Public Interest

I believe that, on the whole, a temporary restraining order will serve the public interest. While the ordinance targets public safety concerns, it could also cause the irreversible closure of numerous stores that serve their surrounding communities. Because I am not convinced that the status quo would cause harm to others, the public interest concern weighs in the plaintiffs' favor.

### Conclusion

For the foregoing reasons, it is accordingly

ORDERED THAT the defendant convenience store owners' motion for a temporary restraining order be, and the same hereby is, granted. The restraining order will be effective July 1, 2008 and will last ten days. Parties shall file status reports upon the expiration of the order.

So ordered.

---

[9]

With regard to the Fifth Amendment takings claim I am slightly less persuaded and feel that the facts may overcome any presumption of irreparable injury. As section A.2.b. shows, any injury would appear to be minimal and reparable.

s/James G. Carr
James G. Carr
Chief Judge